UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re:<br><br>Antoinette D. Davis,<br><br>　　　Debtor.<br>_____<br><br>The Illinois Department of Employment Security,<br><br>　　　Plaintiff,<br><br>v.<br><br>Antoinette D. Davis,<br><br>　　　Defendant.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 23bk07879<br><br>Chapter 13<br><br><br><br>Adversary No. 23ap00285<br><br>Judge Timothy A. Barnes |

TIMOTHY A. BARNES, Judge.

<u>MEMORANDUM DECISION</u>[1]

　　The matter before the court arises out of the Amended Verified Complaint to Determine Dischargeability of Debt [Adv. Dkt. No. 16] (the "<u>Amended Complaint</u>"), filed by the Illinois Department of Employment Security (the "<u>Plaintiff</u>" or "<u>IDES</u>"), in the above-captioned adversary case (the "<u>Adversary</u>").  The Complaint seeks, pursuant to section 523(a)(2)(A) of title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (the "<u>Bankruptcy Code</u>"), a determination of nondischargeability of debt allegedly owed to the Plaintiff by Antoinette D. Davis (the "<u>Debtor</u>") arising out of unemployment benefits paid by the Plaintiff to the Debtor.[2]

---

[1]　　This Memorandum Decision constitutes the court's findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure (the "<u>Civil Rules</u>" and, as to each, "<u>Civil Rule ___</u>"), made applicable to these proceeding by Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>" and, as to each, "<u>Bankruptcy Rule ___</u>").  A separate judgment will be entered pursuant to Bankruptcy Rule 9021 and in accordance with Civil Rule 58(a), made applicable in these proceedings by Bankruptcy Rule 7058.

[2]　　References to docket entries in this Adversary will be noted as "Adv. Dkt. No. ___." References to docket entries in the underlying bankruptcy case, *In re Antoinette D. Davis*, Case No. 23bk07879 (Bankr. N.D. Ill. filed June 16, 2023) (Barnes, J.), will be noted as "Dkt. No. ___." References to exhibits in this Adversary will be noted as "Px. ___" (in the case of Plaintiff's exhibits) or "Dx. ___" (in the case of Debtor's exhibits), as applicable.

For the reasons more fully stated below, the court finds that the debt owed by the Debtor to the Plaintiff constitutes a debt for money obtained by a series of false representations and the debt is nondischargeable under section 523(a)(2)(A) of the Bankruptcy Code. Judgment will be entered in favor of the Plaintiff on the sole, unnumbered count of the Amended Complaint.

JURISDICTION

The federal district courts have "original and exclusive jurisdiction" of all cases under the Bankruptcy Code. 28 U.S.C. § 1334(a). The federal district courts also have "original but not exclusive jurisdiction" of all civil proceedings arising under the Bankruptcy Code or arising in or related to cases under the Bankruptcy Code. 28 U.S.C. § 1334(b). District courts may refer these cases to the bankruptcy courts for their districts. 28 U.S.C. § 157(a). In accordance with section 157(a), the District Court for the Northern District of Illinois has referred all of its bankruptcy cases to the Bankruptcy Court for the Northern District of Illinois. N.D. Ill. Internal Operating Procedure 15(a).

A judge of the bankruptcy court to whom a case has been referred has statutory authority to enter final judgment on any proceeding arising under the Bankruptcy Code or arising in a case under the Bankruptcy Code. 28 U.S.C. § 157(b)(1). Such judges must therefore determine, on motion or *sua sponte*, whether a proceeding is a core proceeding or is otherwise related to a case under the Bankruptcy Code. 28 U.S.C. § 157(b)(3). As to the former, the judge may hear and determine such matters. 28 U.S.C. § 157(b)(1). As to the latter, the judge may hear the matters but may not decide them without the consent of the parties. 23 U.S.C. §§ 157(b)(1), (c). For matters only related to a bankruptcy case, absent consent, the judge must "submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing *de novo* those matters to which any party has timely and specifically objected." 28 U.S.C. § 157(c)(1).

In addition to the foregoing considerations, a judge of the bankruptcy court must also have constitutional authority to hear and determine a matter. *Stern v. Marshall*, 564 U.S. 464 (2011). Constitutional authority exists when a matter originates under the Bankruptcy Code or, in noncore matters, where the matter is either one that falls within the public rights exception, *id.*, or where the parties have consented, either expressly or impliedly, to the bankruptcy judge hearing and determining the matter. *See, e.g.*, *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 669 (2015) (parties may consent to a bankruptcy court's jurisdiction); *Richer v. Morehead*, 798 F.3d 487, 490 (7th Cir. 2015) (noting that "implied consent is good enough").

As a complaint opposing dischargeability of a debt arises only in relation to a bankruptcy case, this matter is expressly a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (I). In accordance with *Stern*, 564 U.S. at 499, a judge of the bankruptcy court has authority to decide matters of nondischargeability, as the dischargeability of a debt is necessarily a matter that would stem from the bankruptcy itself. *Parkway Bank & Tr. v. Casali (In re Casali)*, 526 B.R. 271, 274 (Bankr. N.D. Ill. 2015) (Schmetterer, J.) ("A bankruptcy judge has constitutional authority to enter final judgment as to dischargeability."); *see also Chop Foo, LLC v. Justin S. Fara (In re Fara)*, 663 B.R. 696, 707 (Bankr. N.D. Ill. 2024) (Barnes, J.) (same). Further, each of the parties has either expressly or impliedly consented to the undersigned's exercise of authority over this matter.

2

As a result, there exists jurisdiction, statutory authority and constitutional authority to hear and enter final judgment on the Amended Complaint.

BACKGROUND[3]

This matter arises within the context of the relationship between the Debtor and the IDES that began when the Debtor made a claim for unemployment benefits with the IDES in April of 2020. During the time that the Debtor applied for and received unemployment benefits from the IDES, she was employed by the Illinois Department of Human Services (the "Employer") as a part-time home health aide.

After the Debtor filed the unemployment claim at the center of this dispute on April 5, 2020, she was awarded a weekly benefit amount of $447.00 (the "Weekly Benefit Amount"), plus an additional weekly dependent allowance of $171.00.

That award was not unconditional, however. While a claimant may work while receiving the Weekly Benefit Amount, earnings in excess of fifty percent of the Weekly Benefit Amount are considered disqualifying income which must be reported to the IDES ("Disqualifying Income"). Receipt of Disqualifying Income in a week that is equal to or greater than a claimant's Weekly Benefit Amount renders a claimant entirely ineligible for unemployment benefits that week. However, if Disqualifying Income is less than the Weekly Benefit Amount, what the claimant actually receives is reduced by the Disqualifying Income but not eliminated.

The IDES requires a claimant to certify periodically that she continues to meet the weekly eligibility requirements. For the eighty-four weeks in the period of April 11, 2020, to and including November 13, 2021(the "Reporting Period"), the Debtor certified to the IDES that she was working and reported earned wages ranging from $130.00–392.00. As a result, the IDES paid weekly unemployment benefits to the Debtor in an amount determined by the Debtor's Weekly Benefit Amount (and dependent allowance), less any Disqualifying Income as determined by the Debtor's self-reporting.

Shortly after the Debtor filed for unemployment benefits, the IDES received a protest from the Debtor's Employer which suggested that the Debtor was simultaneously working and collecting unemployment benefits. As a result, the IDES requested and received verification from the Employer of the wages that it paid to the Debtor during the Reporting Period. That verification indicated that, for every week during the Reporting Period, the Debtor actually earned more than she had reported to the IDES. That means that the Debtor did not report to the IDES her actual earnings, a fact that the parties do not dispute.

In May of 2022, the IDES notified the Debtor of this discrepancy between the self-reported and employer-reported wages during the Reporting Period when it mailed a "Claimant Notice of Audit" to the Debtor. The Claimant Notice of Audit also provided a time frame in which the Debtor could respond to the audit and provide additional information if she did not agree with the

---

[3]     The facts in this Background are almost entirely undisputed. They are set forth in detail in the Findings of Fact, below.

wages or benefits paid as reported in the Claimant Notice of Audit.  The Debtor did not respond with that information, timely or otherwise.

In June of 2022, the IDES sent the Debtor a "Notice of Fraud Determination and Recoupment Decision," as defined below, the "Fraud Determination."  The Fraud Determination stated IDES's determination that the Debtor had intentionally failed to accurately report the wages she earned from the Department of Human Services during the Reporting Period which resulted in the overpayment of $18,976.64 of unemployment benefits.  The Fraud Determination also informed the Debtor of the time frame in which she could appeal the decision of the IDES, but the Debtor did not appeal.

According to the IDES's claim, the IDES also assessed a statutory penalty in the amount of $2,571.90 for the Employment Period.  The basis of that penalty is the IDES's belief that the Debtor knowingly made a false statement or failed to disclose a material fact for the purpose of obtaining benefits for which the claimant is not eligible.  The IDES also asserts that the Debtor has been credited with payments in the amount of $420.69 but does not explain that credit.[4]  The IDES asserts that the total amount of overpayment to the Debtor is $21,127.85.

PROCEDURAL HISTORY

On June 16, 2023, the Debtor filed a chapter 13 bankruptcy petition and listed the IDES as a creditor.  Official Form 201, Voluntary Petition for Non-Individuals Filing for Bankruptcy [Dkt. No. 1] (the "Petition").  The result of the filing of the Petition would be that, absent an action such as the one at bar, any obligation she may have to the Plaintiff on the preceding facts would be discharged.

On September 14, 2023, however, the Plaintiff filed its original complaint commencing this Adversary, seeking a determination of nondischargeability with respect to any personal liability the Debtor may have to the Plaintiff.  Verified Complaint to Determine Dischargeability of Debt [Adv. Dkt. No. 1] (the "Original Complaint").

The Debtor failed to answer the Original Complaint within the time proscribed by the applicable federal rules.  As a result, on October 31, 2023, the Plaintiff filed a motion for default judgment.  Motion for Default and Default Judgment [Adv. Dkt. No. 6] (the "Motion for Default").  On December 6, 2023, the Debtor answered the Original Complaint.  Debtor's Answer to Plaintiff's Verified Complaint to Determine Dischargeability of Debt [Adv. Dkt. No. 11] (the "Original Answer").  As a result, on December 7, 2023, the court granted the Plaintiff's oral motion to withdraw the Motion for Default.  Order Withdrawing Motion for Entry of Default [Adv. Dkt. No. 15].

---

[4]     Neither party has explained this $420.69 credit.  At Trial, counsel to the IDES indicated that it was for amounts "recovered," but did not explain how it was recovered.  If it were an actual payment of the Debtor toward the overpayment obligation, the Debtor should have made that clear; otherwise, as is noted herein, the Debtor has made no attempts to repay.  It could also have been deducted by the IDES from benefits otherwise payable.  As it is unclear and as crediting the amount works against the overall interest of the IDES and reduces their claim against the Debtor, the court will accept the IDES's calculation and the application of the credit therein.

On December 28, 2024, the Plaintiff amended the Original Complaint by filing the Amended Complaint. The Amended Complaint, while more fulsome than the Original Complaint, is minimally pled, in apparent reliance on the Plaintiff's administrative decision that the Debtor had "knowingly failed to fully report and disclose her correct earnings for the purpose of obtaining benefits to which she was not entitled." Amended Complaint, at ¶ 20.

On January 24, 2024, the Debtor answered the Amended Complaint. Debtor's Answer to Plaintiff's Verified Complaint to Determine Dischargeability of Debt [Adv. Dkt. No. 20] (the "Amended Answer").

THE TRIAL AND THE EVIDENTIARY AND TRIAL RULINGS

On June 27, 2024, the court entered a pretrial scheduling order. Final Pretrial Order Governing [Trial] [Adv. Dkt. No. 30] (the "Pretrial Order"). Pursuant to the Pretrial Order, the parties were required to submit a joint pretrial statement. Joint Pretrial Statement [Adv. Dkt. No. 31] (the "Pretrial Statement"). That Pretrial Statement contained with it 112 paragraphs of stipulated facts, *id.* at pp. 4–12 (the "Stipulated Facts"), a statement of disputed material facts and lists of witnesses and exhibits that each party planned to offer into evidence at the trial on October 25, 2024 (the "Trial"). *Id.* at pp. 13–15. The parties were also required to make note of any objection to witnesses and/or exhibits and the grounds for any objection. Pretrial Order, at ¶ 3. By the express terms of the Pretrial Order, all exhibits to which no objections were raised in the pretrial statements would be admitted into evidence without the need to establish foundation and the failure to assert an objection would result in the waiver of any prehearing or evidentiary objections that could have been raised by such deadline. *Id.* at ¶ 6. Despite the admission of exhibits by default, the Pretrial Order also provided that if the parties failed to use any exhibit at the Trial, the court would not consider that exhibit to be relevant. *Id.*

As required by the Pretrial Order, on October 11, 2024, the parties filed the Pretrial Statement. Among other things, the Pretrial Statement contained the Stipulated Facts referenced above. In the Pretrial Statement, the Plaintiff proposed ten exhibits and the Debtor proposed two exhibits. Pretrial Statement, pp. 13-15.

The Debtor objected to only one of the Plaintiff's proposed exhibits in the Pretrial Statement: Pretrial Statement, p. 15. That exhibit was the Plaintiff's Notice of Fraud Determination and Recoupment Decisions mailed to Davis on June 1, 2022, related to the period of April 11, 2020, through November 13, 2021. Px. 5 (the "Fraud Determination"). The objection was based on relevance. Pretrial Statement, p. 15.

The Plaintiff objected to both of the Debtor's proposed exhibits: Dx. 1 (Proof of Claim Filed 4/4/2022); and Dx. 2 (Recoupment Decision Mailed 12/3/2021). Pretrial Statement, p. 15. Those objections were also based on relevance. *Id.*

As the only objections raised in the Pretrial Statement are ones of relevance, all of the exhibits noted in the Pretrial Statement were deemed admitted for the purposes of the trial. While it is common for parties to raise a variety of objections in order to preserve issues for a possible later appeal, objections based on rules that seek to shelter juries from cumulative, misleading or other problematic evidence are ordinarily of little use in a bench trial. The judge, as both the trier of the law and the finder of fact, must consider the questioned evidence in order to make any ruling, and,

in any event, such objections result in the judge considering the evidence to resolve the same. *SmithKline Beecham Corp. v. Apotex Corp.*, 247 F.Supp.2d 1011, 1042 (N.D. Ill. 2003) (Posner, J.) ("The court in a bench trial may 'admit evidence of borderline admissibility and give it the (slight) weight to which it is entitled.'"), *aff'd*, 365 F.3d 1306 (Fed. Cir. 2004), *opinion vacated on reh'g en banc and aff'd on other grounds*, 403 F.3d 1331 (Fed. Cir. 2005). As a result, objections based on relevance, weight, prejudice, cumulative evidence, or potential confusion are not effective grounds for exclusion in a bench trial. *Chop Foo*, 663 B.R. at 711 n. 7.

Had the court been inclined to sustain any objections based on relevance, it would have done so with respect to the Fraud Determination. As the Debtor has pointed out, there are issues with respect to the Fraud Determination, not the least of which was that it was performed during the pendency of the Debtor's prior bankruptcy case. *In re Antoinette D. Davis*, Case No. 22bk03022 (filed March 16, 2022, and dismissed April 6, 2023). The Debtor argues that, as a result, the Fraud Determination was made in violation of the automatic stay and thus is void. *In re Whitlock-Young*, 571 B.R. 795, 809 (Bankr. N.D. Ill. 2017) (Barnes, J.). The Plaintiff argues that its actions were the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's or organization's police and regulatory power. 11 U.S.C. § 362(b)(4).

Though a determination made in the context of debt collection and not criminal or quasi criminal in nature does not strike the court as an exercise of police power, *Solis v. Wallis*, Case No. 11 C 3019, 2012 WL 3779065, at *7 (N.D. Ill. Aug. 30, 2012) ("Generally, where 'the focus of the police or regulatory power is directed at the debtor's financial obligations rather than the State's health and safety concerns, [Bankruptcy] Code Section 362(b)(4) is inapplicable.'") (quoting from *In re Sampson,* 17 B.R. 528, 530 (Bankr. D. Conn.1982)), the court need not resolve this dispute here. The Debtor has only raised this issue in the context of an objection to the Fraud Determination, one stated solely in the context of relevance. The Debtor has not properly contested the automatic stay issues in any other context. Even apart from the automatic stay issue, the Fraud Determination is clearly of limited relevance here. The Plaintiff has not argued that its administrative decision binds this court, nor has it argued that this court is precluded from making its Fraud Determination pursuant to section 523(a)(2)(A), and thus any argument to the effect has been waived. The Plaintiff's Fraud Determination is not itself evidence of fraud.

As a result, though the Fraud Determination is of limited probative value, it was admitted. *SmithKline Beecham*, 247 F.Supp.2d at 1042. All objections to the exhibits raised in the Pretrial Statement were therefore overruled. Once again, however, the court noted that the admission of an exhibit alone does not result in it automatically being afforded any weight. It is up to the exhibit's proponent to use the admitted exhibit in such a way that affords it weight, and, of course, the exhibit's own probative value.

As noted above, the court conducted the Trial on the matter on October 25, 2024.[5] During the Trial, the court heard from three witnesses, as follows:

---

[5]   Due to a technical issue during the Trial, a transcript could not be produced. While an audio recording of the Trial was made, a large portion of that audio is inaudible. That issue has delayed this Memorandum Decision. Nonetheless, the court relies on its own contemporaneous notes/recollections from the Trial.

For the Plaintiff:

Abraham Elizondo ("Elizondo"), a Public Service Administrator for the Plaintiff; and

Bonita McGee ("McGee"), an Investigations Manager of Benefit Payment Control of the Plaintiff.

For the Debtor:

The Debtor.

Elizondo was the first witness called by the Plaintiff. He is a Public Service Administrator and is a manager for the overpayment collections unit for the Plaintiff. He has been employed by the Plaintiff for over sixteen years. He testified regarding the functions of the Plaintiff and his specific duties relating thereto. Elizondo testified that, prior to testifying, he reviewed the Debtor's file and the Fraud Determination made by the investigations unit of the Plaintiff. The Debtor applied for regular unemployment benefits and, in addition to those benefits, received emergency unemployment compensation and federal assistance compensation, both federally funded programs. The period in question was April, 2020, to November, 2021. Elizondo further testified that the Debtor was eligible for benefits and received the benefits for which she certified she was eligible.

Elizondo spent a fair amount of time stepping through the Plaintiff's exhibits, explaining the same. While a fair amount of his testimony related to the Fraud Determination, for the reasons stated above, the Fraud Determination stands in this matter only as evidence that the Plaintiff believes its action before this court is well-founded. It has little relevance beyond that. The court has no reason to question the truthfulness of Elizondo's testimony.

The Plaintiff next called McGee, a public service administrator of the IDES's Benefit Payment Control division, who has been employed by the Plaintiff for twenty years. McGee testified that she supervises staff assigned to a unit which is charged with investigating whether or not a case can be determined as fraud. McGee testified that, prior to testifying, she reviewed the Debtor's file. McGee explained the normal investigation process the unit she supervises follows when investigating. McGee also testified with respect to several of the Plaintiff's exhibits and with respect to the Plaintiff's decision making surrounding the Debtor's case. As with Elizondo, the court has no reason to question the truthfulness of McGee's testimony.

Finally, the defense called its only witness, the Debtor. The Debtor testified that during the time that she was receiving unemployment benefits during 2020 and 2021, she was employed part-time by the Employer. The Debtor testified that she was required to report her hours worked to a tracking agency by calling the tracking agency from the client's phone to verify the times she arrived at and left from the client's home and kept no other records of the hours she worked. She also testified that, because she was paid for each pay period approximately thirty days after the end of the pay period, she simply guessed as to the amounts of her weekly earnings when she certified her earnings in order to obtain unemployment benefits. The Debtor testified that she did this for the entire eighty-four weeks she received benefits. Much of the Debtor's testimony related to a handwritten letter that she allegedly sent the Plaintiff, letting the Plaintiff know that she did not admit to the fraud she was accused of. The Debtor testified that she did not recall when she had mailed the letter and neither had she retained any copy of the letter.

7

At the conclusion of the Trial, the matter was taken under advisement.  This Memorandum Decision constitutes the court's determination after the Trial of the matters in the Amended Complaint and concludes all open issues in the Adversary.

FINDINGS OF FACT[6]

From the review and consideration of the procedural background, as well as the evidence presented at the Trial and the filings in this Adversary, the court determines the salient facts to be and so finds as follows:

1.  The Plaintiff, the IDES, is a department of the State of Illinois that is charged with the administration of the Illinois Unemployment Insurance Act pursuant to 820 ILCS 405/100, *et seq.* (the "Act"), Stipulated Facts, at ¶ 1, which provides unemployment benefits to qualifying individuals who are ready, willing and able to work but are unable to find employment.  *Id.* at ¶ 2.

2.  By regulation, the Plaintiff is authorized to establish the required procedures for application and receipt of benefits.  *Id.* at ¶ 3.

3.  Pursuant to 59 Ill. Admin. Code 2720.115, a claimant who has applied for and been awarded unemployment benefits is required to regularly certify to the IDES that he or she continues to meet the eligibility requirements for each week of benefits received.  *Id.* at ¶ 4.

4.  At Trial, Elizondo testified that the certification process requires a claimant to answer certain questions pertaining to the claimant's employment status and the gross amount of wages earned if the claimant worked during the certification period.

5.  Elizondo further testified that the certification process is used to assess a claimant's continued eligibility for benefits.

6.  The IDES may recover benefits awarded to a claimant for any periods for which it determines that the claimant was ineligible to receive them.  Stipulated Facts, at ¶ 5.

7.  A claimant is ineligible for benefits for any week for which she receives Disqualifying Income in an amount equal to or greater than the value of her Weekly Benefit Amount.  If a claimant is employed and receives Disqualifying Income with a value that is less than her Weekly Benefit Amount, she is entitled to partial benefits.  *Id.* at ¶ 6.

8.  Elizondo further testified that any week in which the Debtor worked and earned more than half, but less than her full Weekly Benefit Amount, she was eligible to receive partial benefits; if the Debtor worked and earned less than half of her Weekly Benefit Amount, she was eligible to receive her full Weekly Benefit Amount.

---

[6]  Adjudicative facts may also be found and determined throughout this Memorandum Decision.  To the extent that any of the findings of fact constitute conclusions of law, they are adopted as such, and to the extent that any of the conclusions of law constitute findings of fact, they are adopted as such.

9. Elizondo further testified that there exists a large volume of resources available to each and every claimant regarding the specific requirements for certifying for benefits, and such resources are available through various sources, including the internet, the IDES's Claimant Services phone line, and local offices.

10. On April 5, 2020, the Debtor applied for unemployment benefits from the IDES. Stipulated Facts, at ¶ 9.

11. The Debtor's Weekly Benefit Amount was determined to be $447.00, based on her past four quarters of earnings, among other criteria.  Px. 1, UI Finding, *Qualifying Period Quarters and Wages Paid.*

12. The Debtor received a separate "Dependent Allowance" of $171.00 per week.  *Id.* at *UI Monetary Determination.*

13. Elizondo testified that the Weekly Benefit Amount does not include the Dependent Allowance.

14. During the period of April 11, 2020, to and including November 13, 2021, the Debtor was employed by and earning wages from the Employer.  Stipulated Facts, at ¶ 10–11, Px. 7, pp. 16–24.

15. The Debtor testified that she was required to report her hours worked to a tracking agency by calling the tracking agency from the client's phone to verify the times she arrived at and left from the client's home and she did not keep any other records of the amount of time she worked.

16. Beginning with the week ending April 11, 2020, to and including the week ending November 13, 2021, for each of the eighty-four weeks, the Debtor certified via the internet that she was still working and input an amount into a box labeled "Wages During Week."  Px. 2.

17. Elizondo testified as to the fact that the online certification process is username and password protected.

18. The Debtor testified that when she certified the amount of her wages for unemployment benefits, she estimated or guessed the amount of her wages for the entire eighty-four weeks she received unemployment benefits.

19. Elizondo testified that the amount of benefits a claimant receives may be impacted by the weekly earnings the claimant reports when certifying for benefits.

20. On April 21, 2020, the Debtor certified for unemployment benefits via the internet for the weeks that ended April 11, 2020, and April 18, 2020, and stated that she was still working and had wages of $392.00.  Stipulated Facts, at ¶¶ 12–13.

21. On May 5, 2020, the Debtor certified for unemployment benefits via the internet for the week ending April 25, 2020, and stated that she was still working and had wages of $336.00.  *Id.* at ¶ 14.

9

22.   On May 5, 2020, the Debtor certified for unemployment benefits via the internet for the week ending May 2, 2020, and stated that she was still working and had wages of $364.00. *Id.* at ¶ 15.

23.   Between May 19, 2020, and April 6, 2021, the Debtor certified for unemployment benefits via the internet for a total of forty-eight weeks, beginning with the week ending May 9, 2020, to and including the week ending April 3, 2021, and stated that she was still working and had wages of $280.00. *Id.* at ¶¶ 16–63.

24.   On April 20, 2021, the Debtor certified for unemployment benefits via the internet for the weeks ending April 10, 2021, and April 17, 2021, and stated that she was still working and had wages of $260.00. *Id.* at ¶¶ 64–65.

25.   On May 4, 2021, the Debtor certified for unemployment benefits via the internet for the weeks ending April 24, 2021, and May 1, 2021, and stated that she was still working and had wages of $250.00. *Id.* at ¶¶ 66–67.

26.   On May 18, 2021, the Debtor certified for unemployment benefits via the internet for the weeks ending May 8, 2021, and May 15, 2021, and stated that she was still working and had wages of $240.00. *Id.* at ¶¶ 68–69.

27.   Between June 1, 2021, and June 15, 2021, the Debtor certified for unemployment benefits via the internet for a total of four weeks, beginning with the week ending May 22, 2021, to and including the week ending June 12, 2021, and stated that she was still working and had wages of $250.00. *Id.* at ¶¶ 70–73.

28.   Between June 29, 2021, and September 7, 2021, the Debtor certified for unemployment benefits via the internet for a total of twelve weeks, beginning with the week ending June 19, 2021, to and including the week ending September 4, 2021, and stated that she was still working and had wages of $240.00. *Id.* at ¶¶ 74–85.

29.   On September 21, 2021, the Debtor certified for unemployment benefits via the internet for the weeks ending September 11, 2021, and September 18, 2021, and stated that she was still working and had wages of $220.00. *Id.* at ¶¶ 86–87.

30.   On October 5, 2021, the Debtor certified for unemployment benefits via the internet for the week ending September 25, 2021, and stated that she was still working and had wages of $200.00. *Id.* at ¶ 88.

31.   Between October 19, 2021, and November 16, 2021, the Debtor certified for unemployment benefits via the internet for a total of six weeks, beginning with the week ending October 9, 2021, to and including the week ending November 13, 2021, and stated that she was still working and had wages of $130.00. *Id.* at ¶¶ 90–95.

32.   The IDES paid via direct deposit to the Debtor's bank account the unemployment benefits for the period of April 11, 2020, to and including November 13, 2021, to which the Debtor certified she was eligible. *Id.* at ¶ 97.

33. Pursuant to the CARES Act, in November of 2020, the Debtor was provided with a $600.00 weekly federal supplement in addition to her Weekly Benefit Amount for a total of seventeen weeks, beginning with the week ending April 4, 2020, to and including the week ending July 25, 2020. *Id.* at ¶ 98.

34. Elizondo testified that after the Debtor submitted her unemployment claim to the IDES, the IDES sent notice of the Debtor's unemployment claim to her Employer, the Employer responded with a protest alerting the IDES that the Debtor was working and collecting unemployment benefits, and the IDES sent a tip and lead request to the Employer.

35. McGee testified that the protest the IDES received from the Debtor's Employer around April of 2020 initiated its investigation into the Debtor's unemployment claim, beginning with a "Tip and Lead."

36. On April 6, 2022, the IDES mailed a "Tip and Lead Earnings Verification Request" to the Employer, which sought verification as to the Debtor's self-reported earnings for each week during the Reporting Period. Stipulated Facts, at ¶ 99, Px. 3.

37. In response, the Employer provided the IDES with the weekly earnings of the Debtor for the Reporting Period. Px. 7, Stipulated Facts, at ¶ 100.

38. Elizondo and McGee both testified that once the Employer provided the IDES with the Debtor's weekly earnings for the Reporting Period, those numbers were input into a program which compares the earnings the claimant certified to the earnings the employer provided for each week in order to detect overpayments.

39. McGee also testified that a program determined whether or not benefits were improperly paid based on whether or not the reported wages exceeded the Weekly Benefit Amount and if that program detected an overpayment, a notice of audit would be sent to the claimant.

40. The amount of the Debtor's weekly earnings as reported to the IDES by the Employer exceeded the amount of the Debtor's weekly earnings as self-reported to the IDES in her certifications for unemployment benefits. Stipulated Facts, at ¶ 101, *see* Px. 2 (Debtor's self-reported wages), Px. 7 (Debtor's wages as reported by the Employer).

41. The parties have stipulated that a claimant's earnings which exceed her total Weekly Benefit Amount or exceed fifty percent of her Weekly Benefit Amount are considered Disqualifying Income, which must be reported. The Debtor did not report any Disqualifying Income. Stipulated Facts, at ¶ 106.

42. On May 17, 2022, the IDES mailed a "Claimant Notice of Audit" to the Debtor, which showed the discrepancy in the earnings between those the Debtor self-reported and the earnings provided by the Employer and provided the Debtor with a due date of May 27, 2022, to respond to the audit and provide information if she disagreed with the earnings or benefits paid as shown. The Debtor did not respond. *Id.* at ¶ 102–103, Px. 4.

11

43.    Elizondo testified that from his review of the Debtor's file, she did not respond to the Claimant Notice of Audit.

44.    On June 1, 2022, the Plaintiff mailed to the Debtor the Fraud, which stated the IDES's determination that the Debtor intentionally failed to accurately report her wages earned from the Employer, and, as a result, the Debtor had been overpaid in the amount of $18,976.64. Px. 5, Stipulated Facts, at ¶ 105.

45.    McGee testified that from her review of the file, the Debtor did not respond to either the Claimant Notice of Audit or the Fraud Determination.

46.    The Fraud Determination stated that the Debtor had thirty days from the date it was mailed to appeal the decision, but no timely appeal was made. *Id.* at ¶ 104.

47.    The Debtor testified that she did respond, by sending a hand-written letter to the IDES stating that she did not admit to fraud. The Debtor did not recall which communication from the IDES she responded to or when she had sent the letter. She did not retain any copy of it.

48.    The parties have stipulated that, pursuant to the Act, a claimant may be required to pay a penalty of fifteen percent of the sum of any overpayment for having knowingly made a false statement or having failed to disclose a material fact for the purpose of obtaining benefits for which he or she is ineligible. The IDES assessed the fifteen percent penalty for the period of April 11, 2020, through November 13, 2021, in the total amount of $2,571.90. Stipulated Facts, at ¶ 107.

49.    The parties have stipulated that the IDES applied the Debtor's payments of $420.69 to the total amount of overpayment it asserts against the Debtor. *Id.* at ¶ 108.

50.    The total amount of overpayment the IDES asserts against the Debtor, less the Debtor's payments of $420.69, is $21,127.85. *Id.* at ¶ 109.

51.    On June 16, 2023, the Debtor filed a chapter 13 petition and listed the IDES as a creditor in her schedules. *Id.* at ¶ 7, Dkt. No. 1.

52.    The IDES has filed its claim for a total of $21,127.85. Proof of Claim No. 7-1 (the "IDES Claim"), Official Form 410; Stipulated Facts, at ¶ 8.

APPLICABLE LAW

A.    <u>Dischargeability</u>

The party seeking to establish an exception to the discharge of a debt bears the burden of proof. *Goldberg Secs., Inc. v. Scarlata* (*In re Scarlata*), 979 F.2d 521, 524 (7th Cir. 1992); *Chop Foo*, 663 B.R. at 717. A creditor must meet this burden by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991); s*ee also In re McFarland*, 84 F.3d 943, 946 (7th Cir. 1996), *cert. denied*, 519 U.S. 931 (1996). To further the policy of providing a debtor a fresh start, exceptions to the discharge of a debt are to be construed strictly against a creditor and liberally in favor of a debtor. *In re Crosswhite*, 148 F.3d 879, 881 (7th Cir. 1998); *Meyer v. Rigdon*, 36 F.3d 1375, 1385 (7th Cir. 1994).

12

To succeed in excepting a debt from a debtor's discharge, first, a plaintiff must establish that the debtor owes him a debt. *See Zirkel v. Tomlinson* (*In re Tomlinson*), Case Nos. 96 B 27172, 96 A 1539, 1999 WL 294879, at *7 (Bankr. N.D. Ill. May 10, 1999) (Katz, J.). The court will defer discussion of that issue until part B of the Applicable Law, where the court considers if or how the Debtor might be held accountable under these circumstances.

Second, as section 523 of the Bankruptcy Code enumerates specific, limited exceptions to the dischargeability of debts, a plaintiff must show that the debt falls within one of the specified grounds under section 523(a). *Wachovia Sec., LLC v. Jahelka* (*In re Jahelka*), 442 B.R. 663, 668 (Bankr. N.D. Ill. 2010) (Goldgar, J.).

As to this latter element, there are two sections at issue here, sections 523(a)(2)(A) and 523(a)(2)(B). The Amended Complaint states claims only under section 523(a)(2)(A). Nonetheless, the Debtor has argued that that section 523(a)(2)(B), not section 523(a)(2)(A), should apply.

The court initially notes that, if true, this is the sort of argument that could have and, for the sake of conserving court resources, should have been raised prior to Trial. If the Amended Complaint were improperly pled, there is no point proceeding to Trial on the matter.

The Debtor is not correct, however. The Debtor's certifications via an internet form are statements in writing. *See, e.g., Alpha Tech Pet Inc. v. LaGasse, LLC*, 16 C 4321, 2017 WL 5069946, at *5 (N.D. Ill. Nov. 3, 2017), *aff'd sub nom. Brodsky v. HumanaDental Ins. Co.*, 910 F.3d 285 (7th Cir. 2018) (noting that, in other contexts, Congress has made clear that "in writing" includes e-mail, facsimile and internet).

The Debtor is also incorrect in her assumption that sections 523(a)(2)(A) and 523(a)(2)(B) create a mutually exclusive dichotomy between statements made orally and statements in writing, respectively. Rather, section 523(a)(2)(B) is specific to certain statements in writing that have been carved out of section 523(a)(2)(A), "statement[s] respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). A statement in writing other than one with respect to a debtor's or an insider's financial condition still falls within the scope of section 523(a)(2)(A). *In re Bero*, 110 F.3d 462, 466 (7th Cir. 1997). In *Bero*, the Seventh Circuit rejected an argument that the only objectionable misstatement in writing was one that fell within the scope of section 523(a)(2)(B), but rather found that, even if section 523(a)(2)(B) were to be read narrowly, that did not limit the scope of section 523(a)(2)(B) and that "there were plenty of written statements in this record which could have been found to be misleading." *Id.*; *see also Mayer v. Spanel Int'l Ltd.*, 51 F.3d 670, 675 (7th Cir.) (concluding that in differentiating between sections 523(a)(2)(A) and 523(a)(2)(B), "Congress deliberately distinguished the criteria for discharge according to the kind of document in which the falsehood appears."), *cert. denied*, 516 U.S. 1008 (1995). Thus section 523(a)(2)(B) exists to set criteria for nondischargeability when "the debtor tells a fib in a financial statement," *Mayer*, 51 F.3d at 675, and section 523(a)(2)(B) captures all other "false pretenses, a false representation, or actual fraud," 11 U.S.C. § 523(a)(2)(A), whether that occurs orally or in writing.

The court notes that there is a disagreement between two bankruptcy courts regarding the effect of the Supreme Court's ruling in *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 723 (2018). One bankruptcy court interpreted *Lamar* to conclude broadly that "a statement concerning employment or underemployment is not a statement respecting the debtor's financial condition." *In re Johnson*, Case No. 19-13235-SAL, 2019 WL 4164860, at *4 (Bankr. D. Md. Aug. 30, 2019).

13

Another bankruptcy court interpreted *Lamar* to criticize the outcome in *Johnson*, stating that the issue in *Johnson* had to do with omissions, not statements, and appeared to conclude that *Lamar* should be read so as to make statements made in writing actionable solely under section 523(a)(2)(B). *In re Martinez*, 609 B.R. 351, 375 (Bankr. D. Colo. 2019) (considering a debtor's oral statements over the telephone in response to an AI-like computer prompt to be actionable under section 523(a)(2)(A) as "talking" to a computer).

With respect and keeping in mind that neither *Johnson* nor *Martinez* binds this court, neither *Johnson* nor *Martinez* reflects the true holding of *Lamar*. In *Lamar*, the Supreme Court was considering what constituted a "statement respecting the debtor's financial condition" for the purposes of section 523(a)(2)(B). While there are some statements regarding how section 523(a)(2)(A) has been used, the Supreme Court never limits the scope of section 523(a)(2)(A) in *Lamar*. Neither *Johnson* nor *Martinez* presents facts that would implicate *Lamar*, and nothing about *Lamar* limits the scope of *Mayer* or *Bero*.

    1.     *Count I:  11 U.S.C. § 523(a)(2)(A)*

Section 523(a)(2)(A) provides, in pertinent part, that an individual debtor is not discharged from any debt:

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
>
> > (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition….

11 U.S.C. § 523(a)(2)(A).

Three separate grounds for holding a debt to be nondischargeable are included under section 523(a)(2)(A):  False pretenses, false representation and actual fraud. *Id.*; *see also Deady v. Hanson (In re Hanson)*, 432 B.R. 758 (Bankr. N.D. Ill. 2010) (Squires, J.); *Bletnitsky v. Jairath (In re Jairath)*, 259 B.R. 308, 314 (Bankr. N.D. Ill. 2001) (Goldgar, J.).  The court will consider first false pretense and false representation together, then actual fraud.

    a.     False Pretenses and False Representation

To except a debt from discharge under section 523(a)(2)(A) based on false pretenses or a false representation, a plaintiff must establish the following elements:  (1) the debtor made a false representation or omission of fact; (2) the debtor (a) knew such statement or omission was false or made the same with reckless disregard for its truth and (b) made the same with an intent to deceive; and (3) the creditor justifiably relied on the same. *Reeves v. Davis (In re Davis)*, 638 F.3d 549, 553 (7th Cir. 2011); *see also Ojeda v. Goldberg*, 599 F.3d 712, 716–17 (7th Cir. 2010); *Bero*, 110 F.3d at 465; *Jahelka*, 442 B.R. at 668–69.  A creditor must establish all three elements to support a finding of false pretense or false representation. *Baermann v. Ryan (In re Ryan)*, 408 B.R. 143, 156 (Bankr. N.D. Ill. 2009) (Squires, J.); *see also Rae v. Scarpello (In re Scarpello)*, 272 B.R. 691, 700 (Bankr. N.D. Ill. 2002) (Squires, J.).  Failure to establish any one fact is outcome determinative. *Hanson*, 432 B.R. at 771 (citing *Jairath*, 259 B.R. at 314).

Under section 523(a)(2)(A), "[f]alse pretenses in the context of section 523(a)(2)(A) include implied misrepresentations or conduct intended to create or foster a false impression." *Media House Productions, Inc. v. Amari (In re Amari)*, 483 B.R. 836, 846 (Bankr. N.D. Ill. 2012) (Schmetterer, J.) (citing *Sterna v. Paneras (In re Paneras)*, 195 B.R. 395, 406 (Bankr. N.D. Ill. 1996) (Squires, J.). The implication arises when a debtor, with the intent to mislead a creditor, engages in "a series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances, . . . or understanding of a transaction, in which [the] creditor is wrongfully induced by [the] debtor to transfer property or extend credit to the debtor . . . ." *Paneras*, 195 B.R. at 406 (internal quotations omitted); *see also Amari*, 483 B.R. at 846.

A false pretense does not necessarily require overt misrepresentations. *Paneras*, 195 B.R. at 406. "Instead, omissions or a failure to disclose on the part of the debtor can constitute misrepresentations where the circumstances are such that omissions or failure to disclose create a false impression which is known by the debtor." *Id.*; *see also Hanson*, 432 B.R. at 771 (finding that a false pretense is "established or fostered willfully, knowingly and by design; it is not the result of inadvertence").

In contrast, a false representation is an express misrepresentation that can be demonstrated either by a spoken or written statement or through conduct. *See Scarpello*, 272 B.R. at 700; *In re Philopulos*, 313 B.R. 271, 281 (Bankr. N.D. Ill. 2004) (Schmetterer, J.); *New Austin Roosevelt Currency Exch., Inc. v. Sanchez (In re Sanchez)*, 277 B.R. 904, 908 (Bankr. N.D. Ill. 2002) (Schmetterer, J.). As a spoken or written statement is not required for a false representation, "[a] debtor's silence regarding a material fact can constitute a false representation under § 523(a)(2)(A)." *Hanson*, 432 B.R. at 772 (internal quotation omitted); *see also Scarpello*, 272 B.R. at 700. "A debtor's failure to disclose pertinent information may be a false representation where the circumstances imply a specific set of facts and disclosure is necessary to correct what would otherwise be a false impression." *Ryan*, 408 B.R. at 157 (citing *Trizna & Lepri v. Malcolm (In re Malcolm)*, 145 B.R. 259, 263 (Bankr. N.D. Ill. 1992) (Wedoff, J.)).

An element common to false representation and false pretense is reliance. The Supreme Court has clarified that section 523(a)(2)(A) requires only a showing of "justifiable" reliance. *See Field v. Mans*, 516 U.S. 59, 73–75 (1995); *see also Mayer*, 51 F.3d at 673. Justifiable reliance is a less demanding standard than reasonable reliance and "does not mean that [the creditor's] conduct must conform to the standard of the reasonable man." *Paneras*, 195 B.R. at 406 (quoting *Field*, 516 U.S. at 71). Rather, justifiable reliance "requires only that the creditor did not 'blindly [rely] upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.'" *Ojeda*, 599 B.R. at 717 (quoting *Field*, 516 U.S. at 71).

Whether a party justifiably relies on a misrepresentation is "determined by looking at the circumstances of a particular case and the characteristics of a particular plaintiff." *Id.*; *see also Bombardier Capital, Inc. v. Dobek (In re Dobek)*, 278 B.R. 496, 508 (Bankr. N.D. Ill. 2002) (Schmetterer, J.). "[A] person is justified in relying on a representation of fact 'although he might have ascertained the falsity of the representation had he made an investigation.'" *Mercantile Bank v. Canovas*, 237 B.R. 423, 429 (Bankr. N.D. Ill. 1998) (Lefkow, J.) (quoting *Field*, 516 U.S. at 70). "However, a plaintiff may not bury his head in the sand and willfully ignore obvious falsehoods." *Johnston v. Campbell (In re Campbell)*, 372 B.R. 886, 892 (Bankr. C.D. Ill. 2007) (internal quotations omitted).

15

Several courts in this Circuit have determined that "[t]o satisfy the reliance element of § 523(a)(2)(A), the creditor must show that the debtor made a material misrepresentation that was the cause-in-fact of the debt that the creditor wants excepted from discharge." *Scarpello*, 272 B.R. at 700; *see also Mayer*, 51 F.3d at 676 ("reliance means the conjunction of a material misrepresentation with causation in fact"); *Hanson*, 432 B.R. at 773. Accordingly, these courts have required the plaintiff to show that the debtor's conduct proximately caused the plaintiff's loss, thus making proximate cause an additional requirement under section 523(a)(2)(A). *See In re Luster*, 50 F. Appx 781, 784 (7th Cir. 2002); *Tomlinson*, 1999 WL 294879, at *7; *Microtech Int'l v. Horwitz (In re Horwitz)*, 100 B.R. 395, 397-398 (Bankr. N.D. Ill. 1989) (Katz, J.).

Recently the Supreme Court has clarified that the misrepresentation under section 523 of the Bankruptcy Code goes to how the debt was obtained, not who made the misrepresentation itself. *Bartenwerfer v. Buckley*, 598 U.S. 69, 77 (2023). While this leads to obviously unfair results, making a debtor liable for frauds she had no connection to or knowledge of, that decision binds this court. At first glance, it would appear to call into question the intent precedent discussed above. If a debtor need not even know of the fraud in question, how can a debtor's intent be relevant? *Id.* at 75 ("Passive voice pulls the actor off the stage."). That is, of course, an unfortunate turn of phrase. If intent is an element of fraud, the actor can never truly be off the stage.

Thankfully, *Bartenwerfer* is of little relevance here as the statements in question were those of the Debtor, not some third party. If such statements meet the criteria set forth above, the Debtor may not discharge any personal liability she has to the Plaintiff.

What is clear, though, is this: Whether a plaintiff's reliance is justifiable is still a question for the court, as to hold otherwise would allow a plaintiff to elevate any misrepresentation to the level of nondischargeability. Mere puffery remains inactionable under section 523 of the Bankruptcy Code. *Liebl v. Liebl (In re Liebl)*, 434 B.R. 529, 539 (Bankr. N.D. Ill. 2010) (Schmetterer, J.). As the Seventh Circuit has stated, "no person of ordinary prudence and comprehension would rely" on such puffery. *Corley v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d 990, 1009 (7th Cir. 2004).

        b.      Actual Fraud

A different analysis is used when a creditor alleges actual fraud. In order to except a debt from discharge on the basis of actual fraud, a creditor must establish that (1) a fraud occurred, (2) the debtor intended to defraud, and (3) the fraud created the debt that is the subject of the discharge dispute. *Jahelka*, 442 B.R. at 669; *see also Ryan*, 408 B.R. at 157; *Scarpello*, 272 B.R. at 701; *Jairath*, 259 B.R. 308, 314. The fraud exception to the dischargeability of debts in bankruptcy does not reach constructive frauds, only actual ones. *McClellan v. Cantrell*, 217 F.3d 890, 894 (7th Cir. 2000); *see also Ryan*, 408 B.R. at 157.

Unlike false pretenses and false representations, "actual fraud" does not require proof of a misrepresentation or reliance. *McClellan*, 217 F.3d at 892; *see also Jahelka*, 442 B.R. at 669; *Hanson*, 432 B.R. at 771. While there is no definite rule defining fraud, "it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated." *McClellan*, 217 F.3d at 893 (internal quotations omitted).

It appears that *Bartenwerfer* might negatively affect this analysis as well. Again, if a debtor need not even know of a fraud, *Bartenwerfer*, 598 U.S. at 75, a debtor's intent to defraud is hardly

relevant except as is necessary to establish the fraud itself.  Once again, though, the facts make clear that if a fraud existed, it was one implemented by the Debtor.  Thankfully then, *Bartenwerfer* is of no impact here.

     c.   Intent

   As is noted above, *Bartenwerfer* calls into question years of jurisprudence regarding a debtor's intent in relation to section 523 of the Bankruptcy Code.  Scienter, or intent to deceive, has been for decades a required element under section 523(a)(2)(A) for proving whether the claim is for a false representation, false pretenses, or actual fraud.  *Mayer*, 51 F.3d at 673; *Pearson v. Howard (In re Howard)*, 339 B.R. 913, 919 (Bankr. N.D. Ill. 2006) (Schwartz, J.).  Intent to deceive is measured by the debtor's subjective intention at the time of the representations or other purportedly fraudulent conduct.  *See Scarpello*, 272 B.R. at 700; *see also CFC Wireforms v. Monroe (In re Monroe)*, 304 B.R. 349, 356 (Bankr. N.D Ill. 2004) (Schmetterer, J.).  Subsequent acts of fraud or omissions do not demonstrate that the debtor had the requisite intent at the time the representations were made.  *Standard Bank & Trust Co. v. Iaquinta (In re Iaquinta)*, 95 B.R. 576, 578 (Bankr. N.D. Ill. 1989) (Squires, J.).

   An intent to deceive may be established through direct evidence or inference.  *Monroe*, 304 B.R. at 356 (citing *In re Sheridan*, 57 F.3d 627 (7th Cir. 1995)).  Because direct proof of fraudulent intent is often unavailable, fraudulent intent "may be determined from the totality of the circumstances of a case and may be inferred when the facts and circumstances present a picture of deceptive conduct on the debtor's part." *Cent. Credit Union of Ill. v. Logan (In re Logan)*, 327 B.R. 907, 911 (Bankr. N.D. Ill. 2005) (Cox, J.) (internal quotations omitted); *see also Hanson*, 432 B.R. at 773.  Thus, "[w]here a person knowingly or recklessly makes false representations which the person knows or should know will induce another to act, the finder of fact may logically infer an intent to deceive." *Jairath*, 259 B.R. at 315.

   As noted above, while *Bartenwerfer* removes intent as an independent element of any section 523 analysis, thereby prohibiting debtors from discharging debts arising from frauds which they knew nothing of and had no connection to, *Bartenwerfer* does not remove intent insofar as it is needed to establish the existence of a fraud.  In this context, the fraud in question is actual fraud, not constructive or implied fraud.  As the Supreme Court has stated,

> "[a]ctual fraud" has two parts: actual and fraud.  The word "actual" has a simple meaning in the context of common-law fraud:  It denotes any fraud that "involv[es] moral turpitude or intentional wrong." *Neal v. Clark*, 95 U.S. 704, 709, 24 L.Ed. 586 (1878).  "Actual" fraud stands in contrast to "implied" fraud or fraud "in law," which describe acts of deception that "may exist without the imputation of bad faith or immorality." *Id. Thus, anything that counts as "fraud" and is done with wrongful intent is "actual fraud."*

*Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355, 360 (2016) (emphasis added).

   Thus, following the Supreme Court's non-*Bartenwerfer* jurisprudence means that intent remains an element of actual fraud, though it may no longer be one under misrepresentation.  This has the effect of making the standard for misrepresentation easier to meet than that of actual fraud, which one might expect, but thereby making debtors liable for the more innocuous of statements

17

than for more egregious conduct, which one might not.  The result is that a whole host of "soft" frauds will be nondischargeable, which appears to be what the Supreme Court, if not Congress, intended.

In *Husky*, Justice Sotomayor stated further, "[a]lthough 'fraud' connotes deception or trickery generally, the term is difficult to define more precisely."  *Id.*  "There is no need to adopt a definition for all times and all circumstances here because, from the beginning of English bankruptcy practice, courts and legislatures have used the term 'fraud' to describe a debtor's transfer of assets that … impairs a creditor's ability to collect the debt."  *Id.*

Thus, under section 523(a)(2)(A), fraud, while not precisely defined, is best taken as some sort of intentional act of deception which impairs a creditor's ability to collect a debt, including a fraudulent transfer or conveyance scheme.  *Id.* at 366.

B.    Debt

As noted above, one of the predicates for any determination under section 523 is that the debtor in fact owes a debt to the plaintiff.  *Zirkel*, 1999 WL 294879, at *7.  Here, the debt asserted by the Plaintiff is one entirely grounded in the statutory law of the State of Illinois.

Pursuant to its statutory authority, the IDES may recover benefits that a claimant received for any period that the IDES determines the claimant was ineligible to receive them.  820 ILCS 405/900, 901.  If a debtor is the claimant and the predicates of the statute are met, the resulting amount due is unquestionably a debt.  11 U.S.C. § 101(12) (defining a debt as liability on a claim); *see also Illinois Department of Employment Security v. Taylor (In re Taylor)*, Case No. 21-70349, 2022 WL 3031616, at *5 (Bankr. C.D. Ill. Aug. 1, 2022).

Under that same statute, the IDES has statutory authority to impose a penalty on "an individual who, for the purposes of obtaining benefits, knowingly makes a false statement or knowingly fails to disclose a material fact and thereby obtains any sum as benefits for which … she is not eligible, shall be required to pay a penalty in an amount equal to 15% of such sum."  820 ILCS 405/901.1.

When such a debt is asserted as a claim in bankruptcy, the Bankruptcy Code also comes into play.  In chapter 13, while claims may consist of both scheduled and filed claims and plans may address claims, whether or not allowed, 11 U.S.C. § 1322(b)(4), there exists a lack of clarity whether scheduled claims may be paid under the plan.  *Compare* 11 U.S.C. § 1322(b)(4) (a plan may address "claims") *with In re Pajian*, 785 F.3d 1161, 1163 (7th Cir. 2015) (conflating the requirement under Bankruptcy Rule 3021 that a plan must pay allowed claims with a conclusion that claim must be allowed to be paid).

As is discussed below, because there was a claim filed in this matter, the court need not concern itself with this issue.  As to a filed claim, as this court recently stated, "[a] proof of claim filed in accordance with section 501 creates a rebuttable presumption in favor of the validity and the amount of the claim with the claim itself existing as *prima facie* evidence in support thereof."  *Rosebud*, 660 B.R. at 253 (citations omitted).  Provided the claim is filed in accordance with the applicable statutes and rules, it is presumed valid; to overcome that presumption, a debtor must object to the claim.  *Id.*  Otherwise, the presumptively valid claim will be allowed as filed.  11 U.S.C. § 502(a).

18

DISCUSSION

A.    The Essence of the Plaintiff's Action

In essence, the IDES filed this action against the Debtor praying for a determination of nondischargeability with respect to a debt arising from its payment to the Debtor of unemployment benefits which it alleges that the Debtor was not actually entitled to.  The Debtor was eligible to receive unemployment benefits from the State of Illinois prior to commencing her bankruptcy case.  During the time that the Debtor was eligible to receive unemployment benefits, she was employed part-time and the IDES paid the Debtor those benefits in an amount reduced by the Debtor's self-reported income.  For that period—eighty-four weeks—the Debtor repeatedly and consistently underreported her earned income to the IDES.  As a result, the IDES paid unemployment benefits to the Debtor at a level that exceeded her actual, legal entitlement.  Now, the Debtor owes that overpayment to the State, and as a result, there exists a debt, which makes the IDES a creditor of the Debtor's bankruptcy estate.  The IDES has asked this court to determine that the debt is nondischargeable under section 523(a)(2)(A).

With this in mind, the court will consider Count I, the sole count of the Amended Complaint.

As noted above, for a debt to be nondischargeable under section 523(a)(2)(A), a plaintiff must show that she justifiably relied on a material misrepresentation that was the cause in fact of the debt sought to be excepted from discharge or that the debt in question arose out of fraud.  The court will consider each, in turn.

1.    The Alleged Misrepresentations and the Plaintiff's Reliance on the Same

The Plaintiff alleges the following misrepresentation by the Debtor:  In the process of obtaining unemployment benefits—a process in which the Debtor was required to certify certain information to the Plaintiff on a weekly basis, including what wages she earned if she was employed—the Debtor consistently and repeatedly underreported the wages she earned.

During the Reporting Period, the Debtor certified to the Plaintiff the wages that she earned as a home health aide for each week.  Px. 2.  Subsequently, the Plaintiff sought verification of the Debtor's self-reported wages by sending a Tip and Lead Earnings Verification Request to her Employer.  Px. 3.  In response to the Tip and Lead Earnings Verification Request, her Employer sent the IDES employment records for the Debtor which included the amount of its payments to the Debtor each week during the Reporting Period.  Px. 7.  The Plaintiff then mailed the Claimant Notice of Audit to the Debtor, which showed the discrepancy between the wages that the Debtor reported and the earned wages her Employer reported to have paid her for each week she was paid unemployment benefits.  For every week that the Debtor was paid unemployment benefits, she reported earning wages that were less than the wages that her Employer reported to have paid to her.  Px. 4.

The court is not persuaded by Debtor's testimony at Trial that she guessed the amount of the wages she reported when she certified each week of the Reporting Period because she did not keep her own records of the hours that she worked and she was not paid until thirty days after the pay period ended.  The Debtor knew, or should have known, the wages she reported were not

19

accurate when she was paid, regardless of the length of the pay period. At that point, the Debtor's disclosure of incorrect information created a false impression that she was entitled to more unemployment benefits than she actually was, based on her actual wages. *Paneras*, 195 B.R. at 406. Nonetheless, the Debtor also should have been aware of the inaccuracy when she received the Claimant Notice of Audit from the Plaintiff, which detailed the discrepancies between the amounts the Debtor self-reported earning each week and what the Employer reported that the Debtor had earned. Px.4. At that point, the Debtor had an opportunity to correct any inaccuracies, but the Debtor did not make any such corrections.

The court is also unconvinced by the Debtor's incomplete testimony regarding the response she claims to have sent to the IDES. Nothing in the Debtor's testimony indicated that, other than disclaiming fraud, the Debtor did anything to correct or even respond to the inaccuracies in her reporting to the Illinois Department of Human Services. She never corrected or disputed the individual time records. She also never repaid any overpaid funds. A denial of culpability is simply not responsive to the issues raised by the IDES.

The court accepts the Plaintiff's representation of the actual earnings of the Debtor to be credible evidence of the wages it paid to the Debtor. It is clear to the court that the Debtor did, in fact, misrepresent to the Plaintiff the wages that she was paid by the Employer. The record makes clear that the amount of the benefits the Plaintiff paid to the Debtor were dependent upon the earnings that the Debtor reported to the Plaintiff. It then follows that the Debtor's underreporting of wages resulted in an overpayment of unemployment benefits that the Debtor would not have been the recipient of, but for the Debtor's misrepresentations with respect to the wages she earned during the Reporting Period. The court concludes that the Plaintiff has satisfied its burden with respect to demonstrating that the Debtor's conduct was the proximate cause of the Plaintiff's loss.

2.      Fraud

In order to establish fraud, a plaintiff must show that (1) a fraud occurred, (2) the debtor intended to defraud, and (3) the fraud created the debt that is the subject of the discharge dispute. *Jahelka*, 442 B.R. at 669. The court finds the Debtor's conduct of underreporting her wages in order to receive more unemployment benefits than she was entitled is ripe with the indicia of fraud necessary for the Plaintiff to succeed because fraud "includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated." *McClellan*, 217 F.3d at 893 (internal quotations omitted).

3.      Intent

Despite the Debtor's testimony at Trial that she did not intend to underreport her wages, even if the court were to accept what the Debtor said at face value, the facts of the record belie any testimony from the Debtor. While even self-serving testimony bears some evidentiary weight, *McKinney v. Office of Sheriff of Whitley Cnty.*, 866 F.3d 803, 814 (7th Cir. 2017); *In re Rosebud Farm, Inc.*, 660 B.R. 222 (Bankr. N.D. Ill. 2024), *aff'd sub nom. Longo & Assocs., Ltd. v. Moglia as trustee for Rosebud Farm, Inc.*, Case No. 18 B 24763, 2025 WL 849615 (N.D. Ill. Mar. 18, 2025), the weight of the other evidence outweighs that testimony. *Kaye v. Rose (In re Rose)*, 934 F.2d 901, 904 (7th Cir. 1991) ("Intent may properly be inferred from the totality of the circumstances and the conduct of the person accused."); *In re Barrick*, 518 B.R. 453, 461–62 (Bankr. N.D. Ill. 2014) (Cassling, J.) (same).

20

The facts demonstrate that the Debtor consistently and repeatedly underreported her income for the purpose of obtaining unemployment benefits she was not entitled to receive. Mistake is not a plausible explanation here; the underreporting did not result from some slight inadvertence on the Debtor's part.

The facts demonstrate an intentional course of conduct by the Debtor. Time and time again, the Debtor reported the same exact wages week after week. In the most egregious instance, the Debtor reported having earned $280.00 for a total of forty-eight weeks during the Reporting Period, yet the wages reported by her employer make clear that her earnings varied week to week. Px. 4. The fact that the Debtor consistently underreported her earnings makes mistake an implausible explanation because if it were an honest mistake, it stands to reason that the Debtor would have overreported her earnings at least some of the time. But over the entire reporting period, the Debtor never once overreported her earnings.

B.      The Claim

The court now considers whether the Plaintiff has proven its claim. Even though the parties have stipulated as to various aspects of Illinois law relating to the Plaintiff's claim, the first step the court must take is to independently consider the Plaintiff's Proof of Claim.

The IDES filed the IDES Claim for "Overpayment of Unemployment Benefits due to fraud," attaching as proof the Notice of Fraud Determination and Recoupment Decision that it mailed to the Debtor, which shows the discrepancy between the earnings reported by the Debtor versus those reported by her Employer and the resulting overpayment of benefits by the IDES. That the IDES Claim asserts a total amount due of $21,127.85, consisting of $18,976.64 (the "Overpayment") and a penalty in the amount of $2,571.90 (the "Penalty"), less the unexplained credit of $420.69.

The Debtor has not objected to the IDES Claim.

Based on the evidence adduced at the Trial and the findings made herein, combined with the unobjected to IDES Claim, the court can easily conclude that the Overpayment is a debt owed by the Debtor to the Plaintiff.

The Penalty is not as straightforward. As noted above, the IDES does take a position that the Fraud Determination binds this court's determination of the propriety or amount of the Penalty. At best the Fraud Determination stands for the fact that the IDES has reason to believe it is entitled to the Penalty. Still, the court having already determined that the Debtor knowingly made false statements or failed to disclose a material fact for the purposes of obtaining benefits, it is clear to the court that the predicates of the statute are met and that the IDES is in fact owed a penalty from the Debtor in an amount equal to fifteen percent of the sum of such benefits. 820 ILCS 405/901.1.

While the parties agree that the IDES assessed the Penalty, neither actually explains the calculation of the amount of the Penalty. As noted above, the statute allows the IDES to assert a penalty equal to fifteen percent of the Overpayment. Fifteen percent of the Overpayment of $18,976.64 is $2,846.50, however, which exceeds the Penalty. Even if the unexplained $420.69 credit were applied to reduce the Overpayment, the result would be $2,783.39 in penalties, which

also exceeds the Penalty.  No calculation performed by the court results in the amount of the Penalty—they all exceed it.

While the court cannot therefore verify exact calculation of the $2,571.90 Penalty asserted by the IDES, as all the calculations by the court exceed that amount, the court will accept the lesser amount asserted by the IDES.

Because, as noted above, the court also accepts the $420.69 credit that was not explained by either party, the result is that the IDES Claim stands as the appropriate calculation of the debt owed to the Plaintiff in this matter and the predicates of section 523 are met thereby.

CONCLUSION

For the reasons stated above, judgment will be entered in favor of the Plaintiff on the Amended Complaint.  That judgment will conclude the Adversary.

Dated:    April 4, 2025                              ENTERED:

_____

Judge Timothy A. Barnes
United States Bankruptcy Court

22